IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLENE HOFFMAN,** | : | **Civil No.  4:24-CV-507** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Social Security disability analysis frequently involves the evaluation of a claimant's symptoms of mental impairments such as anxiety and depression. This evaluation requires the consideration of medical records which are often equivocal, since mental health conditions are often cyclical in nature, producing periods of severe debilitating symptoms mixed with periods of stability. Thus, in evaluating such cases, it is incumbent upon Administrative Law Judges (ALJs) to give fair

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

consideration to the medical record as a whole. On this score, it is well-settled that

"[t]he ALJ need not make reference to every relevant note in the record, but the ALJ

may not 'cherry-pick' results that support his conclusion and ignore those that do

not." Stoltzfus v. Berryhill, No. CV 16-6308, 2019 WL 1981888, at *5 (E.D. Pa.

May 1, 2019) (citing Rivera v. Astrue, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014)). And,

in recognizing the cyclical nature of mental health impairments, courts have found,

"it is error for an ALJ to pick out a few isolated instances of improvement over a

period of months or years and to treat them as a basis for concluding a claimant is

capable of working." Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014).

We are reminded of these paradigms in the instant case, in which we are called

upon to review a decision by a Social Security Administrative Law Judge that denied

disability benefits to the plaintiff, Charlene Hoffman. Hoffman filed applications for

disability insurance and supplemental security income benefits alleging that she was

disabled as of January 31, 2018, due to an array of mental impairments, including

severe anxiety with panic attacks and depression. As to these mental impairments,

the record shows her symptoms waxed and waned, with some periods of stability

but that, at their worst, her impairments caused extreme anxiety, panic, and

agoraphobia and that Hoffman reported being unable to leave her home. The record

2

also reflects that, at the beginning of the disability period in 2018, Hoffman was in significant mental crisis and was psychiatrically hospitalized after attempting suicide.

Against this medical backdrop, which showed unequivocally that Hoffman had overdosed on her psychiatric medications during the time her disability application was being evaluated, a fact which was undisputedly known and discussed by the ALJ at the hearing when Hoffman testified she "took a handful of pills," the ALJ made no mention of Hoffman's suicide attempt in the decision denying her benefits, instead writing it off as "voluntary inpatient mental health treatment in February 2018." (Tr. 24). Then, the ALJ, selectively citing medical records showing periods of stability and improvement in her symptoms and focusing on her noncompliance with treatment activities of daily living, found Hoffman's statements regarding her subjective symptoms were not entirely consistent with the record, wholly ignoring her history of suicidal behavior, downplaying her psychiatric hospitalizations, and ignoring periods of severe, debilitating symptoms.

This error on the part of the ALJ in failing to consider the evidence of Hoffman's severe mental health symptomology, including her February 2018 suicide attempt, compels remand. Since the ALJ fashioned an RFC that clearly did not give adequate consideration to this serious manifestation of Hoffman's mental

impairments, more is needed here before we can engage in an informed analysis of this claim. Therefore, for the reasons set forth below, this case will be remanded to the Commissioner for further proceedings.

## II.     Statement of Facts and of the Case

The administrative record of Hoffman's disability application reveals the following essential facts: On November 12, 2020, Charlene Hoffman filed applications for disability insurance and supplemental security income benefits, alleging disability beginning January 31, 2018. (Tr. 90). According to Hoffman, she was totally disabled due to the combined effects of the following impairments: severe anxiety, depression, panic disorder, PTSD, high cholesterol, and acid reflux. (Id.) Thus, Hoffman's reported impairments were both physical and psychological, but her testimony revealed that she was unable to work primarily due to her mental impairments. (Tr. 49). At the time of the alleged onset of her disability Hoffman, who was born in 1970, was forty-seven years old, which is defined as a younger individual under the Commissioner's regulations. (Tr. 89). She turned fifty during the course of her disability proceeding, making her an individual closely approaching advanced age. (Id.) She has a GED and a CNA certificate and had previously worked as a medical assistant, home health aide, and house cleaner. (Tr. 50-51, 79).

4

## A. **Hoffman's Clinical History and the Medical Opinion Evidence.**

With respect to Hoffman's emotional impairments, the clinical record disclosed that her alleged onset date of disability at the end of January 2018 coincided with what appeared to be a period of severe, life threatening psychological symptoms. On February 10, 2018, Hoffman presented to the emergency department for what was identified as a suicide attempt after stating that she had taken twelve Klonopin that morning.[2] (Tr. 521). She was complaining of panic attacks daily for the previous year, had severe depression and suicidal thoughts, and had been self-medicating by "drinking sporadically" for the last six months. (Id.) On February 11, 2018, she underwent voluntary inpatient mental health treatment at Pennsylvania Psychiatric Institute (PPI) for eight days secondary to overdose of Klonopin. (Tr. 525-546). She was discharged home on February 19, 2018, (tr. 539), and began intensive outpatient substance abuse treatment at CPAC on February 20, 2018. (Tr.

---

[2] Whether Hoffman actually intended to end her life by taking twelve Klonopin in February 2018 is not entirely clear. Hoffman later stated that she did not intentionally intend to harm herself and that she was "just having a significant flare of anxiety and took more than her usual amount of Klonopin." (Tr. 555). Nonetheless, the medical records characterize the overdose as a suicide attempt, (tr. 521, 1172, 1186), and Hoffman testified that she "took a handful of pills" at the hearing. (Tr. 62). In our view, whether Hoffman later denied she intended to end her life is irrelevant since the fact that she overdosed on Klonopin during a significant flare of anxiety is unequivocally a significant manifestation of her mental impairments which the ALJ should have addressed in a more fulsome and meaningful fashion.

1165-1271). At her initial assessment, her psychological symptoms were described

as follows:

> Client presents as ox3, with a broad affect and a severely anxious mood. She reports past trauma but did not disclose in detail. Client reports hx of alcohol abuse. She has increased her drinking over the years and is now drinking until blackout. Client reports she drinks as a means to deal with her panic attacks. Client also recently attempted suicide via an attempted suicide. She was admitted to PPI psychiatric hospital for 8 days. Client has a positive family support. Client denies current SIMI, delusion, confusion, or hallucinations. She is currently on psychotropic medications and takes as prescribed. Client would benefit from individual therapy. She would also benefit from Intensive outpatient group therapy but will possibly need to transition into group therapy gradually.

(Tr. 1186). During her outpatient treatment, Hoffman reported she found it difficult

to function and had been isolating because of her panic attacks. (Tr. 1193). A

significant abuse and trauma history was also noted, stating that she was sexually

abused by her father as a child and was living with him at the time of her treatment.

(Tr. 1193-95). She reported feeling extremely anxious and panicky. (Id.) By the end

of March 2018, she was discharged from the outpatient program, against the

facility's advice, due to disengagement. (Tr. 1201). But, by way of explanation, her

primary care notes state that, following her discharge from inpatient treatment, PPI

had not provided her psychiatric follow-up or medication management. Therefore,

she ran out of medication, was experiencing significant anxiety and agoraphobia,

and was afraid to leave her house to attend therapy appointments. (Tr. 658). Her primary care provider noted "it was quite a struggle for her to come into the office today even." (Id.) She reported no significant suicidal ideation at the time but reported significant anxiety, depression, and agoraphobia. (Id.)

She returned to treatment in April 2018 and on a symptom evaluation form reported significant difficulty managing her day-to-day life and coping with her problems and moderate difficulty concentrating. (Tr. 1247). She reported abstaining from alcohol. (Tr. 1228). In June 2018 she reported suicidal ideations to her primary care provider but stated "her kids are the reason that she would not do such a thing." (Tr. 650). It was also noted that she was agoraphobic and "anything out and about, she is not able to do independently." (Id.) In August 2018, Hoffman reported having problems with depression and anxiety "alternating," and stated that Prozac was no longer working and that she had no energy to get out of bed until the afternoon recently. (Tr. 669). Treating psychiatric provider CRNP Janet Marie Passley-Clarke recommended a higher level of care in the form of a partial hospitalization program, but Hoffman was hesitant to commit because she felt that she was unable to drive and would have to depend on others to take her places. (Id.)

At a September 2018 psychiatric evaluation for admission to the partial hospitalization program, Hoffman stated that her anxiety and panic had increased,

7

and she had been drinking more to cope with her anxiety. (Tr. 673). She reported symptoms of depression including having little interest or pleasure in doing things, feeling hopeless, difficulty sleeping, feeling fatigued, having a low appetite, feeling badly and guilty about herself, difficulty concentrating, and feeling that she is moving so slowly that other people notice but she denied thoughts of suicide. (Id.) Her anxiety symptoms were again rated as severe, and she reported confusion, flashbacks, numbness, and occasional insomnia related to her childhood sexual abuse. (Id.) A mental status examination showed anxious mood and guarded affect with fair insight and judgment but intact attention and concentration and cooperative behavior. (Tr. 675). She was diagnosed with major depressive disorder and generalized anxiety disorder with her primary complaint being panic attacks. (Tr. 677). It was noted that her chronic alcohol use possibly contributed to her disorders. (Id.)

Hoffman's participation in the partial hospitalization program was marked by absenteeism, and she frequently reported that she was unable to attend due to difficulty sleeping and other medical problems. (Tr. 681-86). She was eventually discharged from the partial hospitalization program against medical advice for failure to attend but continued medication management with CRNP Passley-Clarke. (Tr. 686). In November 2018 she noted she was driving and felt that the depression

8

had lifted. (Tr. 687). In February and July 2019 she had normal mental status examinations and stated she was doing much better. (Tr. 691-95). In October 2019 she reported to CRNP Passley-Clarke that her anxiety and depression were a little worse but that she was managing. (Tr. 698). She asked for "something more" to assist with depression going into the winter months. (Id.)

At a PCP appointment in October 2019 she noted being stable on her medications but reported still consuming alcohol but being functional. (Tr. 613). She also noted working part-time cleaning and wanting to get back to full-time work but worrying about "random panic attacks," reporting five over the prior three months. (Id.) At a medication management appointment with CRNP Passley-Clarke in January 2020 she reported using benzodiazepines on a more standing basis over the holidays and was advised that the current use of high dose benzodiazepines was not warranted given her diagnosis. (Tr. 702-03). In March 2020 she reported to her PCP that her anxiety and depression were "under control," but also reported feeling down or depressed nearly every day. (Tr. 606). The following month at a medication management appointment she reported taking Klonopin twice daily rather than on an as needed basis but reported that depression "has not been an issue." (Tr. 704). In July 2020 she again reported being stable on her medications and declined therapy. (Tr. 708). She stated she was back at work cleaning homes. (Id.) Hoffman reported

9

feeling more depressed at an August 2020 medication management appointment and contacted a therapy clinic. (Tr. 712). She reported depressed mood, loss of energy, feelings of losing control, and worry and was not working. (Id.)

Then, in January 2021, Hoffman told her primary care provider that she had been experiencing extreme anxiety with almost daily panic attacks over the prior months, especially when she was cleaning homes and driving. (Tr. 593). She stated even small triggers sent her into a full panic attack where she was unable to focus and she had to take medication to calm down. (Id.) She also reported many nightmares due to posttraumatic stress from her childhood abuse. (Id.) Depression and anxiety screenings showed severe symptoms (GAD 7 score 21 out of 21 and her PHQ 9 scored 19 out of 27 which the doctor noted was "high"). She reported fleeting thoughts of suicide and overwhelming fatigue. (Id.) Her generalized anxiety disorder was characterized as "severe and debilitating" and medication adjustments were recommended. (Id.) She also reported feeling more anxious and depressed at a medication management appointment with CRNP Passley-Clarke and reported thoughts about death or suicide, thoughts of worthlessness or guilt, feelings of losing control and worry. (Tr. 721). She did not want any medication changes, although she agreed to a trial of Buspar. (Tr. 721).

Hoffman began individual therapy with Katherine Hutcheson in January 2021. At her initial appointment, it was noted:

> Charlene is currently struggling with her anxiety and depression symptoms. She states she is not able to leave her home due to her anxiety and feels that she has constant panic attacks when she leaves the house to go to the store. Charlene has been able to manage her anxiety in the past and was working with the same company for over 20 years. Charlene states her symptoms have gotten worse over the last two years and is to the point she does not leave her house, except to go to the grocery store.

(Tr. 737). Hoffman stated: "I turtle. I don't do anything I will stay at home in my safe place when my anxiety gets bad and can't do anything social." (Id.) Telehealth visits were suggested to account for Hoffman's difficulty leaving her home. (Id.) She also reported significant depressive symptoms. (Tr. 738). But at a primary care examination in May 2021, she reported her anxiety level being much improved and that she was weaning off all her psychiatric medications and had not had a drink since Thanksgiving 2020. (Tr. 808). In July 2021 she reported to CRNP Passley-Clarke that she was doing better but had not returned to work because she was afraid of becoming anxious. (Tr. 829).

Thus, the medical evidence demonstrates that Hoffman experienced cyclical symptoms of her mental impairments, including periods of severe symptoms like suicidality, agoraphobia, and daily panic attacks and periods of stability.

11

Nonetheless, even during periods when she was experiencing severe symptoms, her mental status examinations were frequently unremarkable in certain mental spheres, showing:

> [T]he claimant is fully oriented and cooperative with full range and appropriate affect, normal perceptions, appropriate appearance, appropriate dress, appropriate grooming, coherent speech, good attention, intact concentration, logical and linear thought process, intact associations, intact recent and remote memory, normal behavior, intact fund of knowledge, intact language, good insight, and good judgment (1F; 3F; 4F; 5F; 7F; 8F; 9F; 10F; 11F; 13F; 16F; 20F; 24F; 27F; 28F; 19F).

(Tr. 24).

Against this clinical backdrop, three medical professionals opined on the limiting effects of Hoffman's mental impairments. One treating source opined that Hoffman's symptoms, specifically absenteeism and off-task time, would render her disabled while two non-treating, non-examining State agency experts concluded her impairments were not severe and caused her, at most, mild limitations in functioning.

Hoffman's treating psychiatric provider, CRNP Pressley-Clark, stated that Hoffman continued to struggle with depression and anxiety and had not returned to work due to concern for anxiety. (Tr. 921). She indicated her prognosis was fair. (Id.) According to CRNP Pressley-Clark, Hoffman had marked limitations in maintaining regular attendance and being punctual and dealing with normal work

12

stress, moderate limitations in sustaining an ordinary routine, making simple work-related decisions, completing a normal workday and workweek, performing at a consistent pace, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers. (Tr. 925). Overall, she opined Hoffman had no limitations in understanding, remembering, or applying information, marked limitations in interacting with others, and moderate limitations in concentrating, persisting, or maintaining pace and adapting or managing oneself but concluded she would be less than 80% as efficient as other workers and would be absent four or more days per month (Tr. 926).

The non-treating, non-examining sources painted a vastly different view of Hoffman's abilities. On initial review of her application in February 2021, State agency psychological consultant Dr. Richard Williams concluded Hoffman had no limitations in her ability to understand, remember, or apply information or adapt or manage oneself and only mild limitations in her ability to interact with others and concentrate, persist, or maintain pace. (Tr. 96). A second non-examining source, Dr. John David Gavazzi, also opined that Hoffman had, at most, mild limitations in her functioning, adopting the same limitations as Dr. Williams. (Tr. 125). Both experts concluded Hoffman's mental impairments were not severe. (Tr. 108, 125). Notably, these experts also significantly downplayed Hoffman's symptoms and did not

13

mention her suicide attempt or inpatient psychiatric hospitalization at the beginning of the relevant period. Indeed, at the time Dr. Williams issued his opinion that Hoffman's impairments were non-severe, she was reporting to her primary care doctor that she was experiencing daily panic attacks and was unable to leave her home due to her anxiety.[3] Thus, the State agency medical opinions recommended, at most, mild limitations in any area of mental functioning but made no accommodations for her history of inpatient psychiatric hospitalization and suicidal tendencies.

It was against this medical backdrop that the ALJ came to hear Hoffman's case.

### B. **The ALJ Hearing and Decision**

A disability hearing and a supplemental hearing were conducted in this case on February 2, 2022, and August 9, 2022, at which Hoffman and a vocational expert testified. (Tr. 38-88). At the first hearing, Hoffman testified that she was unable to drive due to panic attacks, had three to four panic attacks per week and was unable to get out of bed two days per week due to depression. (Tr. 51-57). The ALJ

---

[3] Dr. Williams also glibly characterized Hoffman's history of childhood sexual abuse by her father as "a dysfunctional upbringing." (Tr. 109). In fact, Hoffman experienced PTSD symptoms due to this history of sexual abuse. (Tr. 820, 845, 1075, 1194, 1220, 1248).

14

questioned Hoffman about her February 2018 inpatient treatment, which Hoffman attributed to her panic disorder and depression and stated she "took a handful of pills," but that she was no longer suicidal. (Tr. 62). At the supplemental hearing, a vocational expert (VE) testified that an individual that misses more than one day of work per month on a continuous and ongoing basis would not be able to sustain full-time competitive employment (Tr. 84). The VE also testified that an individual that would be off-task greater than 15% of the workday would not be able to sustain full-time competitive employment. (Id.)

Following the hearing, on February 15, 2023, the ALJ issued a decision denying Hoffman's application for benefits. (Tr. 15-36). In that decision, the ALJ first concluded that Hoffman met the insured status requirements of the Act through December 31, 2022, and had not engaged in substantial gainful activity since January 31, 2018, the alleged onset date. (Tr. 21). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Hoffman had the following severe impairments: moderate recurrent major depressive disorder, anxiety disorder with panic attacks, social anxiety disorder, and post-traumatic stress disorder.[4] (Id.) At

---

[4] The plaintiff does not challenge the ALJ's Step 2 determination that her alcohol dependence was not severe. Nonetheless, the record tends to indicate that Hoffman struggled more with this impairment during the relevant period than the ALJ

Step 3, the ALJ determined that Hoffman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 21-22). At this step, the ALJ seemingly adopted the mental limitations of Hoffman's treating psychiatric provider, concluding she had no limitation in understanding, remembering, or applying information, marked limitations in interacting with others, and moderate limitations in concentrating, persisting or maintaining pace and adapting or managing oneself. (Tr. 22).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Hoffman's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but has the mental capacity for no more than occasional work setting, process, and tool changes. She cannot tolerate work in coordination with others such as tandem or teamwork but can tolerate occasional incidental interaction with people, requires no more

---

explained. In finding her alcohol dependence nonsevere, the ALJ stated, "[c]ounseling managed her alcohol dependence . . . and the claimant testified she no longer drinks alcohol." (Tr. 21). Indeed, the plaintiff testified that she last drank alcohol in January 2018 before going into inpatient treatment, but her medical records show she struggled with drinking alcohol to cope with her anxiety in September 2018, when it was noted that her chronic alcohol use possibly contributed to her disorders, she reported consuming alcohol, but being functional, to her primary care physician in October 2019, (tr. 613), and in May 2021 she stated to her primary care provider that she had not had a drink "since Thanksgiving." (Tr. 808).

16

than occasional supervision and cannot tolerate fast-paced production
rate work or work requiring hourly quotas.

(Tr. 23).

In formulating the RFC, the ALJ did not mention or consider Hoffman's February 2018 overdose which caregivers described as a suicide attempt and occurred during the relevant period, instead focusing first on longitudinal treatment notes showing normal mental examination findings and then stating only, "The claimant underwent voluntary inpatient mental health treatment in February 2018 (3F), at which time, the claimant reports using [alcohol] twice per week, consisting of 10 cans of beer." (Tr. 24) (internal quotations omitted). Thus, the ALJ acknowledged her inpatient psychiatric hospitalization but inexplicably failed to explain that her hospitalization resulted from the most severe manifestation of psychiatric symptoms imaginable: an act of self-harm.

The ALJ then went on to characterize the period following her hospitalization which, as summarized above, the record revealed was marked by severe symptoms in the following terms:

In February 2018, the claimant's counselor stated the claimant "drank alcohol daily. Her intake increased on the weekends where she reports drinking until blackout" (29F/3). In March 2018, the claimant was discharged from counseling as she "disengaged, [u]nable to contact" (29F/37). In April 2018, the claimant's primary care provider noted the claimant "is feeling significant anxiety, depression, agoraphobia

17

> because she has been off her medications" (4F/22; 7F/77). In September 2018, the claimant was referred to a partial hospitalization program after she "was unwilling to make any medication changes" (8F/9), and during this program, the claimant's psychiatrist indicated the claimant "tends to be noncompliant with her medication regimen" (8F/18). The claimant was discharged against medical advice from the partial hospitalization program "due to lack of attendance and compliance" (8F/22). In October 2018, the claimant responded "[t]rue" to the statement "mental health symptoms are under control" (28F/32). In November 2018, the claimant's psychiatric provider observed the claimant "went to 1 meeting with therapist but has not returns. Spoke about h[istory] of missed app[ointmen]t[s] and not following through with mental health care" (8F/23). While the claimant alleges she does not drive, at this time, the claimant's psychiatric provider reported the claimant "is now driving and feels that the depression has lifted" (8F/24).

(Tr. 24). This characterization of this dark period of Hoffman's mental health is remarkable for at least two interrelated reasons. First, it makes clear that the times when Hoffman experienced the worst exacerbation of her mental health symptoms were marked by chronic absenteeism. Moreover, it selectively summarizes the record to demonstrate that the exacerbation of her symptoms during this time was somehow due to Hoffman's noncompliance with treatment. However, what the ALJ failed to mention in this summary was that it was actually the exacerbation of Hoffman's symptoms that prevented her from seeking care. For example, during her outpatient treatment, Hoffman reported she found it difficult to function and had been isolating because of her panic attacks. (Tr. 1193). After being discharged from

the outpatient program due to disengagement in March 2018, she reported to her primary care provider that she had not been connected with follow-up psychiatric care after her inpatient hospitalization, had run out of medication, and was experiencing significant anxiety and agoraphobia and was afraid to leave her house to attend therapy appointments. (Tr. 658). Her primary care provider noted "it was quite a struggle for her to come into the office today even." (Id.) These notes which were omitted by the ALJ show Hoffman's mental health symptoms, including extreme anxiety and agoraphobia, caused her absenteeism.

The balance of the ALJ's RFC assessment similarly focuses only on treatment notes indicating periods of stability, but selectively omits periods when she was experiencing the most extreme symptoms of her mental impairments. For example, the ALJ noted:

> In July 2019, the claimant's psychiatric provider stated the claimant "advised that she is doing much better. She says that she is working and she feels that this is better for her" (8F/32). While the claimant alleges she has three to four panic attacks per week, in October 2019, the claimant's primary care provider noted the claimant's "mood and affect are much improved today," "[d]epression is under good control," and "is working some part-time work with a cleaning company," and "has experienced probably 5 [random panic attacks] over the past 3 months" (7F/32). In April 2020, the claimant's psychiatric provider indicated the claimant "advises that she has been doing ok," "states that [klonopin] has been effective," and "depression has not been a[n] issue" (8F/41). While the claimant alleges she has medication side effects, in July 2020, the claimant's psychiatric provider remarked the claimant is "taking

19

medication without any issues. She states that she has had no [side effects] and does not want any dosage changes," "is now back to work cleaning houses," and "does not desire any therapy services at this time" (8F/45). Although the claimant insists she does not care for anyone, including her mother (Hearing Testimony), in October 2020, the claimant's psychiatric provider noted the claimant reported her "mother falling and having a stroke which has left her with loss of leg movements. Her mother refused a rehab care in facility so [the claimant] now is assuming care at home" (8F/53). In May 2021, the claimant's primary care provider reported the claimant's "overall is doing much better" and "[h]er anxiety level is much improved and she is weaning off all of her psychiatric medications" (12F/17). Although the claimant maintains she does not drive and avoids leaving her home (Hearing Testimony), in November 2021, the claimant's psychiatric provider stated the claimant "drove to this appointment w[ithout] the assistance of her case worker" (16F/8; 24F/8; 26F/8). In May 2022, the claimant's psychiatric provider noted the claimant was "[s]table at this time" (26F/15). In June 2022, the claimant's psychiatric provider indicated the claimant is "doing well on psychiatric medication" (27F/9). There is no medical evidence of record the claimant received inpatient mental health treatment or referral to crisis intervention after February 2018.

(Tr. 25).

This summary was incomplete in that it failed to mention notes during the same relevant period showing exacerbation of the plaintiff's symptoms, including statements to providers that she had been experiencing extreme anxiety with almost daily panic attacks over the prior months, fleeting thoughts of suicide, the characterization by her primary care provider that her generalized anxiety disorder was "severe and debilitating," her reported thoughts about death or suicide, (tr. 721),

20

and therapy notes stating "she is not able to leave her home due to her anxiety and feels that she has constant panic attacks when she leaves the house to go to the store." (Tr. 737). These notes came from the same records the ALJ cited and were undisputedly before the ALJ.

The ALJ then considered the medical opinion evidence, finding each of the opinions, which reached vastly different conclusions about Hoffman's mental abilities, partially persuasive. On this score, the ALJ found the opinion of Hoffman's treating provider persuasive to the extent she opined Hoffman had no limitations understanding, remembering, or applying information, marked limitations interacting with others, moderate limitations concentrating, persisting, or maintaining pace, and moderate limitations adapting or managing herself. (Tr. 26). The ALJ concluded these opinions were consistent with Hoffman's inpatient psychiatric treatment in February 2018, psychiatric care, and medication. (Id.) But the ALJ found the parts of CRNP Passley-Clarke's opinion that would have rendered Hoffman disabled, i.e., her opinion that she would be absent and off-task in excess of allowable standards, unpersuasive and unsupported by her notes showing normal mental status examinations.

As to the much less restrictive opinions of the State agency consultants, the ALJ also found these opinions partially persuasive only insofar as they opined

21

Hoffman had no limitations in understanding, remembering, or applying information, but the ALJ recognized that the remainder of these opinions, understated the plaintiff's marked limitations interacting with others and moderate limitations concentrating, persisting, or maintaining pace and adapting or managing herself and were inconsistent with her inpatient treatment, psychiatric care, and medication.

Thus, the ALJ fashioned an RFC that was more restrictive than the opinions of these State agency consultants, but rejected the opinion of the treating source that Hoffman would be absent and off-task in excess of allowable standards without mentioning Hoffman's documented history of suicidality, periods of severe panic, and agoraphobia.

Having made these determinations, the ALJ concluded that Hoffman could not return to her past skilled work as a medical assistant but that, considering her age, education, and RFC, there were jobs that existed in the significant numbers in the national economy that Hoffman could perform and thus found she had not been under a disability during the relevant period. (Tr. 27-29).

This appeal followed. (Doc. 1). On appeal, Hoffman argues that the ALJ's RFC findings were not supported by substantial evidence and that the ALJ failed to properly evaluate her symptoms. In our view, in rejecting Hoffman's subjective

symptoms, the ALJ mischaracterized the record, including Hoffman's suicide attempt, and failed to account for the cyclical nature of mental illness. This was error. Accordingly, we will remand this case for further consideration by the Commissioner.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be

23

"something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

24

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial

25

review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009). Further, it is clear that this duty of articulation extends to analysis of a claimant's mental and emotional limitations. See generally Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form

27

of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.      Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process,

28

the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other

30

evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

31

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

32

C.      **This Case Will Be Remanded.**

As we have noted, the RFC in this case is flawed in at least two ways. At the outset, standing alone, the ALJ's complete failure to acknowledge or consider Hoffman's history of suicidal ideation and February 2018 suicide attempt requires remand. On this score, an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, it is well settled that "[t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity." Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001). And, "when a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)). Thus, it is well-settled that, at a minimum, a remand is necessary when an ALJ's opinion ignores or fails to address material evidence supporting a disability claim. See Morales v. Apfel, 225 F.3d 310, 312 (3d Cir. 2000). This principle applies with particular force when an ALJ has "ignored competent medical evidence regarding psychological disability in favor of his own contrary conclusion." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1154–55 (3d Cir. 1983).

33

Applying these legal benchmarks, it is generally conceded that an unexplained failure by an ALJ to fully acknowledge or address evidence of suicidal impulses by a disability claimant compels a remand. See, e.g., Salazar v. Barnhart, 468 F.3d 615, 622 (10th Cir. 2006); Glaser v. Bisignano, No. 4:23-CV-1922, 2025 WL 3124700, at *1 (M.D. Pa. Nov. 7, 2025); Roat v. Barnhart, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010). As one court has aptly observed in this regard: "Due to the ALJ's simultaneous silence as to a suicide attempt and reliance on progress notes containing a claimant's denials of suicidal ideations close in time to the suicide attempt, the Court is unable to conclude that the ALJ considered Plaintiff's medical condition as a whole or applied the appropriate legal standards." Lewis v. Colvin, No. 14-14495-CIV, 2016 WL 4810585, at *3 (S.D. Fla. Mar. 4, 2016).

So it is in the instant case.

In February 2018, Hoffman was psychiatrically hospitalized after overdosing on Klonopin and was treated for attempted suicide. (Tr. 521). While she later stated she did not intend to kill herself, the medical records, which were squarely before the ALJ, repeatedly state her hospitalization was secondary to an overdose suicide attempt. (Tr. 521, 1172, 1186). Moreover, her medical records reference severe depression and suicidal thoughts at various points during the relevant period. (Tr. 650, 698, 593, 721). Finally, the plaintiff testified at the hearing that she was

34

hospitalized after she "took a handful of pills" due to her depression. (Tr. 62). Thus, undisputedly before the ALJ was ample evidence that Hoffman had attempted suicide during the relevant period which required hospitalization. Despite this evidence that the ALJ was required to consider in fashioning the RFC, the ALJ made no mention of Hoffman's suicide attempt, instead stating only that, "[t]he claimant underwent voluntary inpatient mental health treatment in February 2018," (Tr. 24). This benign characterization of an attempted act of self-destruction was materially misleading. Rather, the ALJ's failure to acknowledge or address Hoffman's suicide attempt which were clearly before the ALJ was plainly in error, and we find this error to be material and not subject to any form of harmless error analysis. See Pool v. Colvin, No. 15-CV-02061-WHO, 2016 WL 4363405, at *2 (N.D. Cal. Aug. 16, 2016) (concluding that suicide attempt was material evidence for purposes of remand of Social Security Appeal for consideration of new evidence).

While this failure to address the most severe manifestation of Hoffman's mental health symptoms, standing alone, warrants remand, we also find that the ALJ's overarching mischaracterization of the record led to a failure to adequately address the plaintiff's subjective symptoms. On this score, the ALJ concluded that Hoffman's statements regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the record showing normal mental status

35

examinations, noncompliance with treatment, and functional activities of daily living. But in so concluding, the ALJ erroneously focused on parts of the record which supported the rejection of Hoffman's symptoms and ignored parts of the record which tended to support her subjective reports.

This too was error. At the outset, it is well-settled that "[t]he ALJ need not make reference to every relevant note in the record, but the ALJ may not "cherry-pick" results that support his conclusion and ignore those that do not." Stoltzfus v. Berryhill, No. CV 16-6308, 2019 WL 1981888, at *5 (E.D. Pa. May 1, 2019) (citing Rivera v. Astrue, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014)). Indeed, other courts have found substantial evidence does not support the conclusions of an ALJ where the ALJ "selectively cited treatment notes that supported her opinion but ignored contrary portions without explanation." Maximiliano L. v. Kijakazi, No. 3:21-CV-0083, 2022 WL 4550631, at *8 (D.N.J. Sept. 29, 2022) (collecting cases). The selective citation of treatment notes is particularly problematic in the context of mental impairments such as depression and anxiety, which are cyclical in nature. As one court of appeals explained:

> As we have emphasized while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances

36

of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.

Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014)

In this case, Hoffman's medical records are a textbook example of the cyclical nature of mental impairments. Indeed, Hoffman's medical records begin with a severe manifestation of her mental impairments in the form of an intentional overdose and inpatient psychiatric treatment in February 2018, go on to show some periods of improvement and stability in late 2019 and 2020, but then reveal a regression in early 2021 when she reported  daily panic attacks, inability to focus, nightmares, fleeting thoughts of suicide, "severe and debilitating" anxiety, and an inability to leave her home due to anxiety. (Tr. 593, 721, 737-38). In concluding the plaintiff overstated the limitations caused by her mental health symptoms, the ALJ selectively cited the treatment notes showing periods of stability and normal mental status examination findings but ignored the portions of those same records showing the severe manifestations of Hoffman's mental health impairments. In doing so, the ALJ ignored the cyclical nature of mental health impairments. This was error.

Finally, in rejecting the plaintiff's statements regarding the severity of her symptoms, the ALJ paradoxically references the plaintiff's noncompliance with mental health treatment during the period in 2018 when she was experiencing the

most severe exacerbation of her mental health impairments. This characterization of the record ignores the treatment notes during this time which stated Hoffman was, in fact, agoraphobic, and that her anxiety and panic were so severe she was unable to leave her home. For example, during her outpatient treatment, Hoffman reported she found it difficult to function and had been isolating because of her panic attacks. (Tr. 1193). After being discharged from the outpatient program due to disengagement in March 2018, she reported to her primary care provider that she had not been connected with follow-up psychiatric care after her inpatient hospitalization, had run out of medication, and was experiencing significant anxiety and agoraphobia and was afraid to leave her house to attend therapy appointments. (Tr. 658). Her primary care provider noted "it was quite a struggle for her to come into the office today even." (Id.) These notes, which were omitted by the ALJ, show Hoffman's mental health symptoms, including extreme anxiety and agoraphobia, caused her absenteeism. As the plaintiff points out, courts have often adopted the view that noncompliance with treatment is a result of mental impairments. For example, this court has stated:

> In assessing credibility, the ALJ may rely on Plaintiff's course of treatment. SSR 96–7p. However, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other

38

information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Id.

Hennion v. Colvin, No. 3:13-CV-00268, 2015 WL 877784, at *24 (M.D. Pa. Mar. 2, 2015). Here, the plaintiff's well-documented social anxiety, panic attacks, and documented agoraphobia, which the ALJ failed to adequately acknowledge or assess, explain her irregular medical visits. See Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547 (3d Cir. 2003) (quoting Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir.1996) ("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."); Hennion v. Colvin, 2015 WL 877784, at *24 ("Plaintiff's reluctance to participate in a partial hospitalization program may have been a symptom of his agoraphobia, not a sign that his agoraphobia was less limiting").

In sum, while the ALJ cites to the plaintiff's noncompliance with treatment in concluding her symptoms are not as severe as she avers, this noncompliance with treatment in fact proves the opposite in showing that Hoffman's symptoms, at times, were so severe she was unable to leave her home, evidence of chronic absenteeism that the ALJ failed to adequately address. This is a potentially prejudicial oversight since the issue of Hoffman's absenteeism was endorsed by her treating provider in

her opinion which stated Hoffman would be absent more than four days per month. Yet, the ALJ found this opinion unpersuasive based upon his selective summary of the record, a summary which failed to acknowledge material clinical evidence.

Given the ALJ's failure to address material evidence in the record—including evidence of an apparent act of attempted self-destruction—more is needed here. Thus, we conclude that the ALJ's decision in this case is not supported by substantial evidence. Accordingly, we will remand this case to the Commissioner for further consideration of this evidence. Yet, while we reach this conclusion, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, consistent with this opinion that task should remain the duty and province of the ALJ on remand. Finally, because we have found a basis for remand on these grounds, we need not address the plaintiff's remaining arguments since "[a] remand may produce different results on these claims, making discussion of them moot." Burns v. Colvin, 156 F.Supp.3d 579, 598 (M.D. Pa. Jan. 13, 2016)..

## IV.   Conclusion

For the foregoing reasons the plaintiff's request for a new administrative hearing will be GRANTED, the final decision of the Commissioner denying these

claims will be vacated, and this case will be REMANDED to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 13, 2026